IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 15-cv-02231-PAB-KMT

BAKER HUGHES OILFIELD OPERATIONS, INC.,

Plaintiff,

v.

MARK BEARD,

Defendant.

_____

**DECLARATION OF SHAWN SHIPMAN**
_____

I, Shawn Shipman, pursuant to 28 U.S.C. § 1746, declare as follows:

1.  My name is Shawn Shipman. I am of sound mind and over the age of twenty-one (21) and competent to make this declaration. I have personal knowledge of the matters set forth in this declaration.

2.  I am currently employed by Baker Hughes Oilfield Operations, Inc. ("Baker Hughes") as Area Manager for Water Management in the Western Geomarket. Baker Hughes' Western Geomarket is a geographical territory that generally includes the western United States. Most of the state of Colorado is included in the Western Geomarket. Wyoming, Utah, North Dakota, California, Alaska and portions of New Mexico also are part of the Western Geomarket.

3.  Baker Hughes provides technology, equipment, and services for the worldwide oil and gas exploration, development, and production industry. As part of this business, Baker Hughes designs, develops, manufactures, markets, and sells products

Exhibit A

and services relating to water management, integrity management, and flow assurance in the oil and gas industry.

4. Water management generally involves the treatment of water for use in the production of hydrocarbons from wells and the disposal of water used in and produced through production operations.

5. The provision of water management products and services is a very competitive business. Baker Hughes has many direct competitors in this business, including Nalco-Champion, Multi-Chem, Smart Chemical, Tetra Tech, Sabre, Pureline, and Bosque Systems, LLC ("Bosque").

6. As Area Manager for Water Management, I am generally responsible for overseeing operations and sales for Baker Hughes' Water Management product service line in the Western Geomarket. I have responsibility for the success of the product service line in the Geomarket, and I manage a team of employees who help to formulate and execute the Company's business strategy in the Geomarket. Prior to becoming an Area Manager in April 2015, I worked in other positions in Baker Hughes' Water Management product service line. As a result, I am very familiar with the Water Management business in which Baker Hughes is engaged, with Baker Hughes' Water Management customers, and with its competitors in the Water Management business.

7. I came to know Mark Beard through my Baker Hughes employment. Beard reported to me in 2015, before he voluntarily resigned his employment.

8. Baker Hughes hired Beard in 2010.

9. Beard signed an Employee Agreement in connection with the start of his Baker Hughes employment. A true and correct copy of the Employee Agreement is

Exhibit A

attached hereto as Attachment 1. As an Area Manager, I am aware of the fact that Baker Hughes requires its employees to sign and be bound by contracts like the Employee Agreement in order to protect its confidential and trade secret information.

10. In early 2013, Beard accepted a transfer into Baker Hughes' Water Management product service line in the Western Geomarket as an Account Manager. As an Account Manager, Beard served as the face of Baker Hughes to its customers. He was responsible for, among other things, cultivating, managing, and growing Baker Hughes' relationships with customers seeking water treatment, integrity management, and flow assurance products in Colorado and Wyoming.

11. In July 2014, Beard was promoted to Central Rockies Sales Manager. In this role, Beard continued to be responsible for cultivating, managing, and growing Baker Hughes customer relationships. He also became responsible for helping to develop and implement Baker Hughes' Water Management sales strategy for the Western Geomarket. As Sales Manager, Beard also supervised Water Management account managers responsible for territories in Utah and New Mexico. As a Sales Manager, Beard had direct and continuing contact with Baker Hughes' existing and prospective customers and was responsible, along with others, for ensuring Baker Hughes' sales performance.

12. As an Account Manager and Sales Manager, Beard had access to highly confidential and proprietary information belonging to Baker Hughes, including its business plans and pricing; sales history and forecasting; customer sales and work orders; detailed product information; and performance data.

Exhibit A

13. Sometime around May 2015, I verbally offered Beard a promotion that would have expanded the geographic scope of his responsibilities. He told me that he would think about the offer.

14. On June 17, 2015, Beard resigned his Baker Hughes employment. When he resigned, he told me that he planned to start work for Bosque.

15. Baker Hughes and Bosque are direct competitors in the water management business.

16. Although Bosque did not have a significant presence in Colorado prior to June 2015, Bosque has since that time become a direct competitor of Baker Hughes in the water management business in Colorado and the surrounding states.

17. At the time of his resignation, Beard represented to Baker Hughes that he would not have duties or responsibilities relating to Bosque's chlorine dioxide water treatment business and claimed instead to be taking the role of "SWD Facilities Manager," a position relating to salt water disposal. Baker Hughes does not operate in the salt water disposal segment of the water management business.

18. Based on what Beard told me about his new position at Bosque, I did not have reason to believe that Beard would unfairly compete with Baker Hughes. However, after he separated from Baker Hughes and started work for Bosque, I saw his LinkedIn profile and noted that it identified his Bosque position as "Rocky Mountains Regional Business Manager," rather than SWD Facilities Manager.

19. I also learned after Beard separated from Baker Hughes and started work for Bosque that Beard had deleted information from his Baker Hughes-issued laptop before returning it to the company in connection with his resignation. It is my

4

understanding that the deletion activity makes it difficult to analyze Beard's use of the computer.

20. In or around August 12, 2015, I was performing a safety audit for Baker Hughes customer Noble Energy at the customer's site near New Raymer, Colorado. While at Noble's site, I encountered Beard working for Bosque on a Noble chlorine dioxide unit unrelated to salt water disposal. This is inconsistent with the fact that, at the time of his resignation, Beard told me that he would be working for Bosque as a SWD Facilities Manager. Baker Hughes is very active in the chlorine dioxide segment of the water management business. Noble was the primary customer that Beard serviced on behalf of Baker Hughes during his Baker Hughes employment.

21. Based on the fact that what Beard told me about his job with Bosque seemed to be untrue, and on the fact that Beard had deleted information from his company-issued computer before returning it to Baker Hughes, I became concerned that Beard might be unfairly competing with Baker Hughes for the benefit of Bosque.

22. Around this time, Baker Hughes investigated Beard's computer use and his use of Baker Hughes' e-mail systems during the period shortly before his resignation. The investigation revealed that, on June 17, 2015—the day he resigned his Baker Hughes employment, Beard forwarded over 50 e-mails, some with attachments, from his Baker Hughes e-mail account, "Mark.Beard2@bakerhughes.com", to his personal Gmail e-mail account, "markbeard3682@gmail.com". A true and correct copy of a spreadsheet identifying the e-mails that Beard forwarded from his Baker Hughes e-mail account to his personal e-mail account on June 17, 2015 is attached as Attachment 2.

Exhibit A

23. I have reviewed the e-mails and files that Beard forwarded to his personal e-mail account on the day of his resignation. The e-mails and files contain substantial Baker Hughes confidential and proprietary information. Among the information forwarded by Beard on the day of his resignation is pricing information for specific customers and product lines, historical revenue reports, business plans, and customer invoices, proposals, and work orders.

24. One of the e-mails that Beard forwarded from his Baker Hughes e-mail account to his personal e-mail account on June 17, 2015 is an e-mail transmitting Baker Hughes' Addendum to its 2011 U.S. Land Price Book for its Pressure Pumping Business Segment, which includes its Fracing, Cementing, Coiled Tubing, and Water Management product service lines. The Addendum sets forth changes to Baker Hughes' customer pricing effective May 1, 2015, shortly before Beard resigned. The Addendum contains a confidentiality legend that states: "THIS PRICE BOOK IS THE PROPERTY OF BAKER HUGHES INCORPORATED AND CONSTITUTES THE CONFIDENTIAL AND PROPRIETARY INFORMATION OF BAKER HUGHES INCORPORATED AND ITS AFFILIATES. ALL PRICES AND INFORMATION ARE PROVIDED SOLELY FOR INDIVIDUAL CUSTOMER INTERNAL USE ONLY AND MAY NOT BE DISTRIBUTED TO ANY THIRD PARTY. NO PORTION OF THE INFORMATION CONTAINED HEREIN MAY BE COMMUNICATED TO ANY COMPETITOR OR POTENTIAL COMPETITOR OF BAKER HUGHES INCORPORATED."

25. One of the e-mails that Beard forwarded from his Baker Hughes e-mail account to his personal e-mail account on June 17, 2015 is an e-mail attaching a Baker Hughes price reduction agreement for Water Management chemicals with its customer

Exhibit A

Noble Energy. The agreement is titled "Water Management Chemicals BWO 15-0112-Amendment No. 1". The agreement is effective April 21, 2015, shortly before Beard resigned his Baker Hughes employment, and sets forth the specific details of concessions Baker Hughes made to Noble Energy on pricing for certain Water Management chemicals.

26. One of the e-mails that Beard forwarded from his Baker Hughes e-mail account to his personal e-mail account on June 17, 2015 is an e-mail attaching a spreadsheet titled "2013 Revenue Template". The spreadsheet summarizes for the period of January 2013 through June 2015 the revenue Baker Hughes generated through sales of Water Management products and services by specific date, specific customer, specific customer jobsite, and specific product/chemical.

27. One of the e-mails that Beard forwarded from his Baker Hughes e-mail account to his personal e-mail account on June 17, 2015 is an e-mail attaching a spreadsheet designed to calculate Baker Hughes customer pricing (and price quotes) for specific Water Management jobs. The spreadsheet is titled "WAM Pricing Calculator v1_2". The top of the spreadsheet is marked "INTERNAL USE ONLY – Pricing Worksheet – INTERNAL USE ONLY". After a user inputs basic information about a Water Management job, the spreadsheet calculates Baker Hughes' associated revenue, variable costs, total job costs, cash margin, and job margin.

28. One of the e-mails that Beard forwarded from his Baker Hughes e-mail account to his personal e-mail account on June 17, 2015 is an e-mail that I sent him on May 18, 2015, shortly before he resigned his Baker Hughes employment. Among the attachments to the e-mail are four PowerPoint presentation files titled "Western Geo Dec

Exhibit A

3 2014", "Southern WAM Presentation for FY15 Jan Plan", "WAM Permian Jan Plan 2015 12.03.2014", and "WAM Central January Plan 2015 PP final". Each of these files summarizes Baker Hughes' Water Management operations and sales business plans for 2015 for a specific Geomarket—Western, Southern, Permian, or Central. The presentations set forth historical revenue totals and well as information about revenue forecasts and plans for 2015. The presentations also identify specific business opportunities and challenges by customer and summarize go-forward business strategies for Baker Hughes' Water Management business nationwide. Three of the four presentations are marked on the cover slide with the following: "TERMS AND CONDITIONS OF USE: BY ACCEPTING THIS DOCUMENT, THE RECIPIENT AGREES THAT THE DOCUMENT TOGETHER WITH ALL INFORMATION INCLUDED THEREIN IS THE CONFIDENTIAL AND PROPRIETARY PROPERTY OF BAKER HUGHES INCORPORATED AND INCLUDES VALUABLE TRADE SECRETS AND/OR PROPRIETARY INFORMATION OF BAKER HUGHES (COLLECTIVELY, "INFORMATION"). BAKER HUGHES RETAINS ALL RIGHTS UNDER COPYRIGHT LAWS AND TRADE SECRET LAWS OF THE UNITED STATES OF AMERICA AND OTHER COUNTRIES. THE RECIPIENT FURTHER AGREES THAT THE DOCUMENT MAY NOT BE DISTRIBUTED, TRANSMITTED, COPIED OR REPRODUCED IN WHOLE OR IN PART BY ANY MEANS, ELECTRONIC, MECHANICAL, OR OTHERWISE, WITHOUT THE EXPRESS PRIOR WRITTEN CONSENT OF BAKER HUGHES, AND MAY NOT BE USED DIRECTLY OR INDIRECTLY IN ANY WAY DETRIMENTAL TO BAKER HUGHES' INTEREST."

29. The information that Beard forwarded from his Baker Hughes e-mail account to his personal e-mail account on the day he resigned his Baker Hughes employment is secret and valuable to Baker Hughes.

30. For example, Baker Hughes distributes information about its standard pricing terms within its organization to enable its sales professionals to make sales. It does not publish its pricing terms to the public or to its competitors and the 2011 U.S. Land Price Book Addendum referenced above is marked with a confidentiality advisory. Likewise, information about specific customer pricing terms, including discounts, and purchasing/revenue history is used by Baker Hughes sales professionals to fulfill customer needs and to establish and grow customer relationships. This information is not published publicly or distributed within Baker Hughes other than on a need-to-know basis.

31. Baker Hughes' sales strategies, particularly strategies relating to sales to specific customers, are at the heart of the company's advantage over its competitors in the marketplace. The strategies are formulated based on intelligence and information gathered by operations and sales professionals throughout Baker Hughes' Water Management organization. The strategies represent an investment by Baker Hughes of thousands of hours of work and millions of dollars.

32. Baker Hughes derives value from the information that Beard forwarded from his Baker Hughes e-mail account to his personal e-mail account on the day he resigned his Baker Hughes employment by virtue of the fact that such information is not known to Baker Hughes competitors such as Bosque. I believe that, in his new role at Bosque, Beard could use the information to unfairly compete with Baker Hughes. And if such information were divulged to a competitor such as Bosque, I believe that the competitor

could use the information to unfairly compete against Baker Hughes. The competitor could, for example, use the information to unfairly undercut Baker Hughes' prices. It could seize for itself business opportunities that Baker Hughes identified through its significant investment of time and money. A competitor like Bosque also could use the information to enter a new market and gain a competitive foothold faster than it would if it were forced to develop its own market and customer intelligence and business strategies.

33. Baker Hughes takes measures to keep secret and confidential the type of information that Beard forwarded from his Baker Hughes e-mail account to his personal e-mail account on the day he resigned his Baker Hughes employment. For example, Baker Hughes requires its employees to enter into agreements (like the Employee Agreement attached as Attachment 1) that prohibit the unauthorized possession, disclosure, or use of Baker Hughes confidential or proprietary information. Further, Baker Hughes uses on documents written confidentiality and trade secret advisories. The advisories expressly state that a document contains confidential or trade secret information that cannot be possessed, used, or disclosed without authorization. Additionally, information such as that that Beard forwarded to his personal e-mail account on June 17, 2015 is distributed within Baker Hughes on a need-to-know basis.

34. I am concerned that Beard has and is unfairly competing against Baker Hughes for the benefit of Bosque using Baker Hughes' confidential and proprietary business information. Beard's title at Bosque, Regional Business Manager, suggests to me that he has job duties that are the same as or similar to the duties he held just before he resigned his Baker Hughes employment. Additionally, in the time since Beard joined Bosque, Bosque has established a business presence in Colorado and has secured for

Exhibit A

itself what I believe to be its first business in the area. This business is with Noble Energy, a Baker Hughes customer that Beard was responsible for servicing during his Baker Hughes employment. Bosque currently continues to service Noble Energy and has the potential to take even more of Noble Energy's business away from Baker Hughes. In the time since Beard joined Bosque, Baker Hughes has lost millions of dollars in revenue from Noble Energy to Bosque.

35. In my experience, customers do not generally discuss which competing companies are soliciting their business or the types of information such competing companies are using to do so. As a result, it has been difficult for me to obtain complete information about which Baker Hughes customers Beard has contacted on behalf of Bosque and what information he is using in connection with such contacts. It also has been difficult for me to learn when and under what circumstances Beard may have first contacted these customers on behalf of Bosque.

36. In my experience, it takes a significant amount of time—sometimes years—for Baker Hughes to establish and develop a strong relationship with a customer. Similarly, it may take a Baker Hughes Account Manager or Sales Manager well over a year to learn a customer's preferences and develop a good working relationship with a customer.

37. I reserve the right to amend or supplement this declaration, and to testify to other matters, based on additional information and analysis from discovery or otherwise.

Exhibit A

Exhibit A

I declare under penalty of perjury that the foregoing is true and correct, and that this declaration was executed on February 1, 2016.

_____
SHAWN SHIPMAN

Exhibit A